# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ANGELICA A.,

      Plaintiff,

      v.

MARTIN J. O'MALLEY,
  COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

No. 20 CV 6402

Magistrate Judge McShain

## MEMORANDUM OPINION AND ORDER

Plaintiff Angelica A. appeals the Commissioner of Social Security's decision denying her application for benefits. For the following reasons, plaintiff's motion to reverse or remand [22] is denied, defendant's motion for summary judgment [24] is granted, and the decision denying the application for benefits is affirmed.[1]

## Background

### A.    Procedural Background

In February 2018, plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging an onset date of January 7, 2018. [14-1] 14. The claim was denied initially and upon reconsideration. [*Id.*]. Plaintiff requested a hearing, which was held by an administrative law judge (ALJ) in November 2019. In a decision dated December 6, 2019, the ALJ denied plaintiff's claim. [*Id.*] 14-32. The Appeals Council denied review in September 2020 [*id.*] 1-6, making the ALJ's decision the agency's final decision. *See* 20 C.F.R. §§ 404.955 & 404.981. Plaintiff then appealed to this Court [1], and the Court has subject-matter jurisdiction over the appeal pursuant to 42 U.S.C. § 405(g).[2]

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except for citations to the administrative record [14], which refer to the page numbers in the bottom right corner of each page.

[2] The parties have consented to the exercise of jurisdiction in this case by a United States Magistrate Judge. [5, 6].

### B. ALJ's Decision

The ALJ reviewed plaintiff's disability claim in accordance with the Social Security Administration's five-step sequential-evaluation process. At step one of her decision, the ALJ found that plaintiff had not engaged in substantial gainful activity since his alleged onset date. [14-1] 16. At step two, the ALJ determined that plaintiff suffered from five severe impairments: a history of multiple sclerosis, venous insufficiency, depression, bipolar disorder, and generalized anxiety disorder. [*Id.*] 16-19. At step three, the ALJ ruled that plaintiff's impairments did not meet or equal the severity of a listed impairment. [*Id.*] 19-23. Before turning to step four, the ALJ determined that plaintiff had the residual functional capacity (RFC) to perform less than a full range of sedentary work with the following restrictions:

> The claimant can never climb ladders, ropes or scaffolding and can no more than occasionally climb ramps and stairs, balance, stoop, crouch, kneel, crawl, bend or twist. The claimant must be provided a sit-stand option allowing her to stand for 1-2 minutes after sitting for 30 minutes. She should avoid concentrated exposure to extreme heat and work hazards such as unprotected heights and dangerous moving machinery. The claimant can understand, remember and carry out no more than simple routine tasks with no public contact and no more than occasional contact with co-workers and supervisors. She should not have any strict quotas (she should not engage in work where someone checks up on her throughout the workday to make sure she is on pace with a set goal, quota or with other employees), but can do work where her performance is measured by what is completed by the end of the workday. The claimant should not engage in work where a machine sets the pace of work.

[*Id.*] 23-30.

At step four, the ALJ found that plaintiff could not perform her past relevant work as an administrative clerk. [14-1] 30. At step five, the ALJ determined that jobs existed in significant numbers in the national economy that plaintiff could perform, such as document preparer (30,000 jobs), addresser (25,000 jobs), and preparer (40,000 jobs). [*Id.*] 30-31. The ALJ accordingly ruled that plaintiff was not disabled and denied her application for benefits.

### Legal Standard

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted

or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the ALJ conducts a sequential five-step inquiry: (1) whether the claimant is unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any listed impairments; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

The Court reviews the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019)). "When reviewing a disability decision for substantial evidence, we will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination so long as substantial evidence supports it." *Warnell v. O'Malley*, 97 F.4th 1050, 1052-53 (7th Cir. 2024) (internal quotation marks and brackets omitted).

## Discussion

### I.    Plaintiff's Mental Limitations

Plaintiff first argues that the ALJ "failed to properly accommodate [her] documented limitations in the ability to concentrate, interact with others, or complete work-related tasks within the context of a full-time work schedule." [22] 7. Plaintiff concedes that the ALJ's decision contains a "lengthy" assessment of the evidence of her ability to understand, remember, and apply information; to concentrate, persist, and maintain pace; to interact with others; and to adapt and manage herself. [*Id.*].[3] But plaintiff appears to fault the ALJ for ruling that plaintiff had only mild or moderate–rather than marked or extreme–limitations in these areas of mental functioning. *See* [*id.*] 7-9. Plaintiff also contends that the ALJ's findings undermined the RFC determination. *See* [*id.*] 7, 9-11.

---

[3] The ALJ made these findings at step three of her decision, but plaintiff does not challenge the ALJ's determination that her impairments did not meet or equal a listed impairment. *See* [22] 9 ("Plaintiff is not arguing that the finding of no listing level severity at Step 3 was in error[.]").

3

The Court rejects this argument for at least four reasons. First, plaintiff's argument essentially asks the Court to reweigh the evidence and draw different conclusions than those reached by the ALJ. For example, in challenging the ALJ's finding that plaintiff had only a mild limitation in understanding, remembering, and applying information, plaintiff contends that the ALJ made "irrelevant observation[s]," did not give sufficient weight to "more relevant evidence," discussed certain favorable evidence only "in passing," and erred by concluding that plaintiff's deficits were primarily a consequence of her fatigue. [22] 7-8. Similarly, in challenging the ALJ's determination that plaintiff had only a mild limitation in interacting with others, plaintiff concedes that the ALJ "acknowledged [her] reports of difficulties arising out of social anxiety, depression, and frustration with her illness," but faults the ALJ for citing only to "somewhat unimpressive sporadic capabilities . . . to undermine Plaintiff's reports." [*Id.*] 8. Likewise, plaintiff contests the ALJ's finding that she had only a moderate limitation in the ability to concentrate, persist, and maintain pace because the ALJ overemphasized evidence that plaintiff does not believe is probative to this issue (her ability to drive and prepare basic meals) and improperly focused on "relatively unremarkable findings on mental status examinations[.]" [*Id.*] 9. Finally, regarding the ALJ's finding that plaintiff was only mildly limited in adapting or managing herself, plaintiff recognizes that the ALJ "acknowledged challenges [in this area] documented by a psychological examiner," but faults the ALJ for finding these challenges "to be cancelled out by the unrelated findings that she was calm and oriented." [*Id.*] 22. All of these arguments go beyond the scope of this Court's limited and deferential review of the ALJ's decision, which does not permit the Court to "reweigh the evidence, resolve debatable evidentiary conflicts, . . . or substitute [its] judgment for the ALJ's determination[.]" *Warnell*, 97 F.4th at 1052.

Second, plaintiff's contention that the ALJ merely summarized the evidence (as opposed to analyzing and evaluating it) and discussed evidence that was favorable to her disability claim only "in passing" demands more from the ALJ than what the applicable regulations and controlling case law require. "Time and time again," the Seventh Circuit has "emphasized that social-security adjudicators are subject to only the most minimal of articulation requirements. An ALJ need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning." *Warnell*, 97 F.4th at 1053. In any event, the ALJ's lengthy and extremely detailed discussion of plaintiff's mental functioning and the evidence that bore on that issue suffices to allow the Court "to assess the validity of the agency's ultimate findings and afford [plaintiff] meaningful judicial review." *Id.* at 1054 (internal quotation marks omitted).

In this case, the ALJ found that:

[i]n understanding, remembering or applying information, the claimant
has a mild limitation. The claimant complained of memory issues and

4

being forgetful and that she does not handle funds due to cognitive issues (Ex 6F; Ex 4E). The claimant's boyfriend reported that he reminds her to take medication and to care for her personal needs (Ex 5E). Nonetheless, the claimant completed her high school education and beauty school per testimony and has past relevant work that is semi-skilled per vocational expert testimony. Further, the claimant has the ability to understand, remember, or apply information to drive regularly (Ex 4E; Ex 5E; Ex 10E; Ex 6F; Ex 9F). The ability to drive includes having the memory to operate your vehicle and to know what signs and signals mean, to understand a destination and to apply directions on how to get there, and to identify and react to multiple stimuli on the road, including driving hazards, and to make rapid, accurate, and safe decisions. While the claimant and her boyfriend claimed that the claimant is not able to handle funds due to cognitive problems (Ex 4E; Ex 5E; Ex 10E), the record shows otherwise and she is able to do so (Ex 6F; Ex 9F; Ex 14F). The claimant has the mental capacity to prepare simple food (Ex 4E), but claimed at the hearing that she is too tired. The claimant reportedly does not do chores, but she does fold laundry (Ex 4E; Ex 5E) and did not indicate mental reasons for not doing chores. Moreover, the claimant can be at appointments alone with no concern of an inability to understand, remember, or apply information. The claimant is able to understand, remember, or apply information to paint since the alleged onset date, although at the hearing she stated that she has not done it for a year but will do it if she gets inspiration. In addition, the claimant is able to understand, remember, or apply information to read self-help materials and books about PTSD (Ex 4E; Ex 5E; Ex 9F; Ex 21F, 44; Ex 25F, 41). The claimant reported that she could understand, remember, or apply information at the psychological consultative examination to read and watch television (Ex 9F). The claimant also can understand, remember, or apply information to care for a pet cat (Ex 9F), such as feeding and changing the litter box per hearing testimony and to shop using a personal computer (Ex 4E; Ex 5E; Ex 10E). The claimant can understand, remember, or apply information to learn and to continue to use email, Facebook, and texting on cell phone (testimony). The claimant has a good ability to understand, remember, or apply information as she exhibited good knowledge of her medications at the hearing. Concerning the medical evidence, the claimant underwent a psychological evaluation in June 2018 where her overall intellectual functioning was assessed to be in the average range (Ex 8F, 35). The doctor at the psychological consultative examination in July 2018 found that the claimant's short-term memory was excellent, that her delayed memory was good, that her immediate memory was within average limitations, and that her fund of information was fair (Ex 9F). In addition, the claimant was assessed with an intact memory

and normal fund of knowledge at medical visits in the record (Ex 10F, 3, 11-12; Ex 18F, 10; Ex 21F, 52). However, a more recent neuropsychological evaluation from August 2019 indicated that the claimant had selective, but significant reductions in aspects of anterograde memory and verbal fluency, but also found that her intellectual functions were estimated to be in the average range (Ex 22F). Overall, the state agency found that the claimant had no limitation in her ability to understand, remember, or apply information, but the claimant complained of a memory problem and this was noted in the evidence not seen by the state agency (see Ex 22F) and also she reportedly needs reminders to take medication (Ex 4E; Ex 10E), so these allegations are given consideration to find that she is mildly limited in this area. Nonetheless, no greater limitations are warranted as the claimant is able to understand, remember, or apply information to drive, to handle funds, to go out alone without getting lost or confused, to learn and use a cell phone, and to manipulate in email/texting and Facebook.

In interacting with others, the claimant has a mild limitation. The claimant reported decreased socialization and problems getting along with others due to social anxiety and depression and being short-tempered and frustrated with her illness (Ex 4E; Ex 10E). Nonetheless, the claimant is able to be in public to shop, to attend appointments, and to go out and visit others per her report at the psychological consultative examination (Ex 9F) and to take walks (Ex 10E) with no evidence of abnormal behavior. The claimant has friends (Ex 9F) and is able to have a relationship (testimony). The claimant is able to go out in public to go to a dispensary to buy marijuana as well as to attend medical appointments (testimony). The claimant can go out alone without evidence of having problems with others (Ex 10E; Ex 4E). The claimant does not isolate as she drives to places, visits with others, and stays in touch using social media, email and texting (testimony; Ex 9F). The claimant also reported having plans to go out for drinks with coworker shortly before the alleged onset date (Ex 4F, 43), attending a wedding (Ex 4F, 67), and recently being away on vacation for two weeks (Ex 25F, 44, 46). Concerning the medical evidence, the examining doctor at the internal medicine consultative examination in May 2018 assessed that the claimant was appropriate, polite, pleasant, and cooperative (Ex 6F). The claimant underwent a psychological evaluation in June 2018 where it was noted that her social functioning identified challenges, such as impulsivity, irritability, and mood swings (Ex 8F, 35). Still, the examining doctor indicated that she was cooperative and respectful during the evaluation (Id. at 32). The doctor at the psychological consultative examination in July 2018 found that the claimant's interaction style was distant and her speech quality was soft, but that

6

she showed no problem expressing herself (Ex 9F). In addition, a more recent neuropsychological evaluation from August 2019 indicated that the claimant presented in a friendly, personal, cooperative, engaging, cordial, polite, and respectful manner (Ex 22F). Overall, the balance of the evidence shows that the claimant has no more than a mild limitation in interacting with others. The undersigned notes that the residual functional capacity set forth below nonetheless includes social limitations due to the claimant's speech and language complaints discussed in more detail herein.

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. The claimant reported problems with concentration and completing tasks due to racing manic, depression, brain fog from multiple sclerosis, hallucinations, night terrors, and cognitive problems (Ex 10E). Nonetheless, the claimant has the ability to concentrate, persist, or maintain pace to drive regularly (Ex 4E; Ex 5E; Ex 10E; Ex 6F; Ex 9F). The ability to drive includes concentrating on the road and reacting to multiple stimuli, including driving hazards, to make rapid, accurate, and safe decisions as well as to persisting and maintaining pace while driving to follow directions to reach her destination. While the claimant and her boyfriend claimed that she is not able to handle funds due to cognitive problems (Ex 4E; Ex 5E; Ex 10E), the record shows otherwise and she is able to do so (Ex 6F; Ex 9F; Ex 14F). The claimant has the mental capacity to prepare simple food (Ex 4E), but claimed at the hearing that she is too tired. The claimant reportedly does not do chores, but she does fold laundry (Ex 4E; Ex 5E) and did not indicate mental reasons for not doing chores. Further, the claimant can be at appointments alone with no concern of an inability to concentrate, persist, or maintain pace. The claimant is able to concentrate, persist, or maintain pace to paint since the alleged onset date, although at the hearing she stated that she has not done it for a year but will do it if she gets inspiration. The claimant is able to concentrate, persist, or maintain pace to read self-help materials and books about PTSD (Ex 4E; Ex 5E; Ex 9F; Ex 21F, 44; Ex 25F, 41) and to do yoga (Ex 11F, 44). The claimant can concentrate, persist, or maintain pace to care for a pet cat (Ex 9F), such as feeding and changing the litter box per hearing testimony, and to shop using a personal computer (Ex 4E; Ex 5E; Ex 10E). The claimant can concentrate, persist, or maintain pace to learn and to continue to use email, Facebook, and texting on cell phone (testimony). In addition, the claimant can concentrate, persist, or maintain pace to receive, read, and compose and send texts/emails (testimony). The claimant has a good ability to concentrate, persist, or maintain pace as she exhibited good knowledge of her medications at the hearing. Concerning the medical evidence, the claimant underwent

a psychological evaluation in June 2018 where the examining doctor found that she displayed adequate attention and concentration during the interview and testing session and that her thought process was intact (Ex 8F, 32). The doctor at the psychological consultative examination in July 2018 found that the claimant demonstrated an adequate ability to complete a multi-step task test, completed serial 3's, and correctly spelled the word "WORLD" forward and backward, although it was judged that the claimant put forth poor effort on each of the mental status examination tasks (Ex 9F). In addition, the claimant was assessed with normal attention/concentration at medical visits in the record (Ex 10F, 3, 12; Ex 18F, 11; Ex 21F, 52). Moreover, a recent neuropsychological evaluation from August 2019 indicated that the claimant had intact basic attention and span of apprehension, sustained attentional capacity, processing speed, and general executive functions (Ex 22F). Overall, the record as a whole demonstrates that the claimant has a moderate limitation in this area, which has been accounted for by limiting the claimant to simple, routine tasks and other pacing/production restrictions.

As for adapting or managing oneself, the claimant has experienced a mild limitation. The claimant reported that she has trouble handling stress and changes in routine and that she is scared of everything (Ex 4E; Ex 10E). Still, the claimant is able to be alone and responsible for own [*sic*] safety and security while her boyfriend works (testimony). The claimant is able to be in public to shop, to attend appointments, and to go out and visit others per her report at the psychological consultative examination (Ex 9F) and to take walks (Ex 10E) with no evidence of abnormal behavior. The claimant is able to handle personal care (Ex 6F; Ex 9F), but complained of problems with heat and blacking out (Ex 4E; Ex 10E) and not mental limitations. Further, there is no evidence of the claimant having a problem controlling her emotions outside of her residence. The claimant can go out alone without evidence of getting lost or confused or having problems with others (Ex 10E; Ex 4E). Concerning the medical evidence, the examining doctor at the internal medicine consultative examination in May 2018 assessed that the claimant was alert and oriented with good hygiene and grooming and exhibited no signs of depression, agitation, irritability, or anxiety (Ex 6F). The claimant underwent a psychological evaluation in June 2018 where it was noted that her emotional functioning identified challenges, such as fears, nervousness, and physiological symptoms (Ex 8F, 35). Still, the examining doctor indicated that the claimant was calm and oriented throughout the evaluation (Id. at 32). The doctor at the psychological consultative examination in July 2018 found that the claimant was oriented and well-groomed and appropriately dressed (Ex 9F).

8

Moreover, a recent neuropsychological evaluation from August 2019 indicated that the claimant was assessed with a pleasant mood and that her tolerance for frustration was noted to be normal and characterized by intact emotional resiliency (Ex 22F). Given the above, the undersigned finds that the claimant has a mild limitation in adapting or managing herself.

[14-1] 19-22.

Third, the Court concludes that the ALJ's findings, set forth at length above, were supported by substantial evidence. For each of the four functional areas, the ALJ gave "explicit rationales based on evidence in the record" and thus satisfied her minimal burden to articulate the basis for her decision. *Edwin L. v. Kijakazi*, No. 20 C 2680, 2021 WL 5630781, at \*3 (N.D. Ill. Dec. 1, 2021). Furthermore, and contrary to plaintiff's argument, the ALJ acknowledged the severity of her alleged symptoms and discussed evidence that was consistent with those allegations, but relied on other evidence in the record to find that plaintiff was only mildly or moderately limited in these areas. Thus, the Court finds that the ALJ's decision has a substantial basis in the evidence. *See Meghan S. v. Kijakazi*, No. 20 C 1592, 2021 WL 4146913, at \*3 (N.D. Ill. Sept. 13, 2021) ("The ALJ's weighing of the evidence regarding the first paragraph B criterion was fully explained and is supported by substantial evidence.").

Fourth, the Court rejects plaintiff's argument that the ALJ failed to consider the extent of her physical and mental limitations together and whether, despite those limitations, plaintiff had the RFC to perform full-time work. Plaintiff recounts the evidence of her physical limitations that supported her disability claim, *see* [22] 10-11–nearly all of which the ALJ addressed–but she does not engage with the ALJ's extended discussion of this evidence and why she did not believe it demonstrated that plaintiff was disabled. *See* [14-1] 24-29 (ALJ's discussion of, *inter alia*, plaintiff's multiple sclerosis and related symptoms, venous insufficiency, and fatigue). Nor has plaintiff identified entire lines of evidence that the ALJ failed to consider. *See Ferida H.M. v. O'Malley*, No. 22 C 6341, 2024 WL 942552, at \*4 (N.D. Ill. Mar. 5, 2025) (while ALJ need not discuss every piece of evidence in record, ALJ may not "ignore an entire line of contrary evidence"). Fairly read, the ALJ's decision minimally articulates the ALJ's reasons for finding that plaintiff could perform a very limited range of sedentary work, notwithstanding that her severe impairments caused meaningful work-related limitations. *See Victor M. v. Kijakazi*, No. 20-cv-7073, 2022 WL 2105893, at \*8 (N.D. Ill. Jun. 10, 2022) (courts must "read[ ] the ALJ's decision as a whole and giv[e] it a commonsensical reading rather than nitpicking at it").

## II.    Subjective Symptom Determination

Plaintiff next argues that the ALJ "relied upon improper inferences and false equivalencies to undermine [her] subjective symptoms." [22] 12. In support, plaintiff

contends that the ALJ (1) "zeroed in on a supposed misstatement" that plaintiff made at the hearing, describing her dizziness as blacking out, but that plaintiff immediately corrected; (2) gave undue weight to plaintiff's ability to drive a car but ignored that plaintiff had to pull off the road once when she experienced headaches and vertigo; (3) improperly focused on the absence of "documentation" that would have substantiated plaintiff's allegations; (4) emphasized that plaintiff's symptoms had improved with treatment even though "there is certainly no indication in the record that treatment helped to the point where Plaintiff would be able to work full time"; and (5) found that plaintiff was not fatigued "all the time" despite the fact that plaintiff has a chronic condition and was "likely to have good days and bad days." [*Id.*] 12-13.

"Social Security Regulation 16-3p outlines a two-step process for an ALJ to follow when evaluating a claimant's subjective symptoms. First, the ALJ must determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce his or her symptoms. Next, the ALJ must evaluate the intensity, persistence, and functionally limiting effects of the individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." *Maria S. v. Kijakazi*, No. 20 C 6727, 2023 WL 7130376, at \*7 (N.D. Ill. Oct. 30, 2023) (internal quotation marks and citations omitted). "[T]he ALJ must explain her subjective symptom evaluation in such a way that allows the Court to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Charles B. v. Saul*, Case No. 19 C 1980, 2020 WL 6134986, at \*6 (N.D. Ill. Oct. 19, 2020) (internal quotation marks and brackets omitted). "The Court will overturn an ALJ's evaluation of a claimant's subjective symptom allegations only if it is patently wrong." *Id.* (internal quotation marks omitted). "[F]laws in the ALJ's reasoning are not enough to undermine the ALJ's decision that [a claimant] was exaggerating her symptoms. Not all of the ALJ's reasons must be valid as long as enough of them are." *Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009) (emphasis in original). The Seventh Circuit has stated that it "would not reverse the credibility determination as long as the ALJ provided at least one reason to support the finding." *Schrank v. Saul*, 843 F. App'x 786, 789 (7th Cir. 2021).

The ALJ concluded that plaintiff's "statements about the intensity, persistence, and limiting effects of her symptoms" were "inconsistent because the evidence generally does not support the alleged loss of functioning." [14-1] 26. For the following reasons, the Court finds that the ALJ's subjective symptom determination was not patently erroneous.

First, the ALJ permissibly considered the inconsistencies between plaintiff's claims in a function report, *see* [14-1] 252-56, that she could not bathe, cook, or do other physical activities because she would "black out" or faint, and her hearing testimony that these activities did not cause her to black out, but to get "really dizzy,"

[*id.*] 48. *See Zach v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) ("To determine the credibility of allegations of disabling pain, an ALJ may consider several factors, including objective medical evidence and any inconsistencies between the allegations and the record."). Because the inconsistency identified by the ALJ had a basis in the record, it was for the ALJ alone to decide how much weight to give that inconsistency and how to weigh it against the other factors that bore on the credibility of plaintiff's allegations. *See id.* ("We do not decide questions of credibility, deferring instead to the ALJ's conclusions unless patently wrong.") (internal quotation marks omitted). Second, the ALJ permissibly considered evidence of plaintiff's ability to drive a car in discounting the severity of her alleged symptoms. In evaluating a claimant's subjective symptom allegations, an ALJ must consider the claimant's ability to perform activities of daily living. *See* 20 C.F.R. § 416.929(c); SSR 16-3p, 2017 WL 5180304, at \*5, 7-8 (Oct. 25, 2017). Here, the ALJ explained that plaintiff's ability to drive "a couple times a week, including 20 minutes to get to her doctor," was inconsistent with plaintiff's allegations that her vertigo caused disabling limitations and that she "drops things and has trouble reaching overhead[.]" [14-1] 26. Third, it goes without saying that it was permissible for the ALJ to contrast the severity of plaintiff's allegations with the lack of objective evidence documenting these limitations. *See Anders v. Saul*, 860 F. App'x 428, 434 (7th Cir. 2021) ("ALJ permissibly discounted Anders's testimony as inconsistent with the objective evidence" because there was "no record evidence from Anders's treatment providers recommending that he elevate his legs at all, let alone at the frequency and duration that Anders reported"). Fourth, it was proper for the ALJ to consider and weigh the evidence that plaintiff's migraines improved with treatment. *See Brian W. v. Kijakazi*, No. 22 C 4802, 2023 WL 3568669, at \*6 (N.D. Ill. May 18, 2023) ("it was appropriate for the ALJ to consider Plaintiff's improvement, including with respect to the ALJ's credibility determination"). Here, there was substantial evidence that plaintiff experienced fewer migraines when she received regular Botox injections, and the ALJ was entitled to weigh that evidence against the alleged severity of plaintiff's symptoms. *See* [14-1] 17, 26. Finally, the ALJ was entitled to find that plaintiff's fatigue did not cause disabling limitations, given the evidence that plaintiff "is able to drive regularly, to go visit friends, and to go out alone and can be home alone," [14-1] 27, and the fact that the treatment notes prepared by Dr. Grace Chang, one of plaintiff's doctors who prepared a Fatigue Report, "does not show concern of the claimant's fatigue precluding her work activity," [*id.*] 29.

In sum, the ALJ identified multiple valid reasons for discounting plaintiff's subjective symptom allegations and her subjective symptom determination was not patently erroneous. *See Schrank*, 843 F. App'x at 789; *Halsell*, 357 F. App'x at 722.

## III.    Opinion Evidence

Finally, plaintiff argues that the ALJ improperly rejected the opinions of four of her treaters. [22] 14-15.

"An ALJ has an obligation to evaluate every medical opinion and explain the weight given to the opinion." *Georgios A. v. Kijakazi*, No. 20-cv-2729, 2022 WL 1004249, at \*5 (N.D. Ill. Apr. 4, 2022) (internal quotation marks omitted). The ALJ "will not defer or give any specific weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from a [claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the ALJ need only explain "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record." 20 C.F.R. § 404.1520c(b). In deciding how persuasive a given opinion or finding is, the ALJ considers "supportability, consistency, relationship with the claimant, specialization, and other factors that tend to support or contradict" the opinion or finding. *Victor F. v. Kijakazi*, No. 22 C 1451, 2023 WL 2429357, at \*3 (N.D. Ill. Mar. 9, 2023). "Supportability and consistency are the two most important factors." *Id.* Supportability means "how well the objective medical evidence and supporting explanations presented by a medical source support the opinion," and consistency means "how consistent the opinion is with other record evidence." *Amaris R. v. Saul*, No. 20 C 1695, 2022 WL 972324, at \*2 (N.D. Ill. Mar. 31, 2022).

"An ALJ's decision must explain how she considered the factors of supportability and consistency, but she is not required to explain how she evaluated the other factors." *Victor F.*, 2023 WL 2429357, at \*3. "While a detailed analysis is not required, the ALJ must consider the regulatory factors and explain why a medical opinion is not supported or is not consistent with the record to give a reviewing court the bridge to connect the outcome to the record." *Id.* (internal quotation marks and brackets omitted).

### A.    Dr. Bielet

In March 2018, plaintiff's family medicine doctor, Julia Bielat, prepared a treatment note stating "Parking placard completed" after plaintiff requested the placard because her multiple sclerosis caused vertigo. *See* [14-1] 496. The ALJ did not find this evidence to be "persuasive as to the issue of disability as the criteria used for a parking placard is not consistent with the Social Security Act criteria for determining disability." [*Id.*] 28. The ALJ also noted that Dr. Bielat had not cited to her treatment note to support her apparent conclusion that plaintiff needed a parking placard, and that in any event plaintiff's vertigo was not "incapacitating" because she remained capable of driving several times per week. [*Id.*]. Plaintiff appears to fault the ALJ's analysis because, "based upon the record, we have no idea what the criteria for a parking placard are." [22] 14. But that hole in the record only undermines plaintiff's claim, for it was plaintiffs burden to prove that the criteria Dr. Bielat used to determine whether she needed a parking placard were similar to or probative of the criteria governing her disability claim. *See Scheck v. Berryhill*, 357 F.3d 697, 702 (7th Cir. 2004) ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability.").

## B.    Dr. Cheng

Plaintiff's neurologist, Dr. Grace Cheng, prepared a Fatigue Report in July 2019 in which she opined that plaintiff's fatigue significantly affected her social functioning, her ability to complete activities of daily living, and her ability to perform sedentary work on a full-time basis. [14-1] 686-89. The ALJ did not find Dr. Cheng's opinion persuasive for multiple reasons, including (1) the criteria Dr. Cheng used were inconsistent with SSA criteria for determining disability; (2) Dr. Cheng's treatment notes did not reflect "concern of the claimant's fatigue precluding her work activity"; (3) there was no indication in Cheng's treatment notes that plaintiff suffered significant fatigue flare-ups; and (4) Cheng's opinion was inconsistent with plaintiff's ability to drive. [*Id.*]. The Court finds that the ALJ's rejection of Dr. Cheng's opinion was supported by substantial evidence. The ALJ specifically found that Dr. Cheng's opinion that plaintiff's fatigue precluded her ability to perform sedentary work was not supported by her own treatment records, and plaintiff does not identify any line of evidence that the ALJ failed to discuss that would undermine that conclusion. *See Quinton B. v. O'Malley*, No 20 CV 5471, 2024 WL 665930, at *13 (N.D. Ill. Feb. 16, 2024) (ALJ permissibly rejected treating physician's opinion as to disabling effects of plaintiff's asthma because "the fact that [doctor's] treatment records generally corroborated the fact that plaintiff experienced significant symptoms from asthma did not require the ALJ to credit [doctor's] unsupported opinion that the symptoms were so severe as to preclude the ability to work"). Likewise, the ALJ permissibly found that Dr. Cheng's opinion that plaintiff's fatigue was disabling was inconsistent with the undisputed evidence that plaintiff regularly drove multiple times per week, an activity that the ALJ reasonably found to be significant because it required plaintiff to "identify and react to multiple stimuli on the road" and "to make rapid, accurate and safe decision." [14-1] 10-20. Because the ALJ considered the supportability and consistency of Dr. Cheng's opinion, the ALJ did not err.

## C.    Dr. Shetty

Plaintiff's psychiatrist, Dr. Akshatha Shetty, prepared a Mental Residual Functional Capacity Statement in July 2019, opining that plaintiff's mental impairments would preclude her from performing several work-related activities for ten percent of a work day, including performing tasks that involved understanding and memory, concentration, social interaction, and adaption. [14-1] 691-92. Dr. Shetty also opined that plaintiff's mental impairments would cause her to be "off task" for at least thirty percent of the workday. [*Id.*] 693. As with the other medical opinions, the ALJ gave multiple reasons why she did not find Dr. Shetty's opinion persuasive: (1) while Shetty had "checked off many items on the form," the doctor had not "refer[red] to the actual documented record to support the claimed restrictions"; (2) nothing in plaintiff's "mental health treatment records"–"including Dr. Shetty's own contemporaneous treatment notes"–supported the degree of limitations that

13

Shetty identified; and (3) Dr. Shetty's treatment notes reflected that plaintiff was "oriented, appeared neat and clean and was cooperative, was attentive/focused, and had an intact memory." [*Id.*] 29. Contrary to plaintiff's argument, the Court finds that the ALJ gave a reasoned explanation for discrediting Shetty's opinion and that the ALJ's finding that Dr. Shetty's opinion was exaggerated, unsupported, and inconsistent with the record had substantial evidentiary support. As discussed above with respect to plaintiff's first argument, the ALJ evaluated plaintiff's mental impairments and the limitations they caused at length, persuasively explaining why plaintiff had only mild or moderate–and not extreme–limitations in these areas. Having analyzed that evidence in depth at step three of her decision, the ALJ was not required to repeat that discussion while evaluating Dr. Shetty's opinion. Finally, plaintiff does not cite to entire lines of evidence that the ALJ impermissibly ignored in evaluating Shetty's opinion.

### D.    Counselor Deandresi

Plaintiff's counselor, Cecilia Deandresi, submitted a report in June 2019 that stated that plaintiff's multiple sclerosis, bipolar disorder, and anxiety and panic disorders markedly restricted her daily activities, her socialization, and her ability to sustain concentration and attention. [14-1] 718-19. The ALJ did not find this opinion persuasive because "mental status examinations of record are inconsistent with marked level findings" because exams showed "no abnormalities." [14-1] 29-30. The ALJ also explained that Deandresi's opinion that plaintiff's hallucinations contributed to her marked restrictions did not account for the fact that plaintiff's hallucinations improved when taking medication and "hallucinations were not seen to be an ongoing medical concern in the record." [*Id.*]. Finally, the ALJ found that Deandresi's opinion was inconsistent with the record as whole because "such significant restrictions and problems assessed by Ms. Deandresi are not seen/discussed in the record." [*Id.*]. Because substantial evidence supports the ALJ's finding that Deandresi's opinion was not well-supported or consistent with the record, the Court finds that the ALJ permissibly concluded that the opinion was unpersuasive.

14

## Conclusion

For the reasons set forth above, plaintiff's request to reverse and remand the SSA's decision [22] is denied, defendant's motion for summary judgment [24] is granted, and the SSA's decision denying plaintiff's applications is affirmed.

_____

**HEATHER K. McSHAIN**
**United States Magistrate Judge**


**DATE: May 14, 2024**